## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATRINA FULTON and DARNELL WALCOTT, on behalf of themselves and all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NEW YORK and NEW YORK CITY DEPARTMENT OF CORRECTION,<br><br>Defendants. | Civil Action No.: 1:20-cv-00144<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Katrina Fulton and Darnell Walcott, by and through their attorneys, Faruqi & Faruqi, LLP, hereby allege as follows against Defendants City of New York (the "City") and New York City Department of Correction ("DOC") (together, "Defendants"):

### NATURE OF THE CLAIMS

1.      Plaintiffs have dedicated their lives to public service, each having served in the U.S. Armed Forces and worked for Defendants as Correction Officers for several years.

2.      Despite this, Defendants have engaged in a systemic pattern of discrimination against Plaintiffs and all other members of DOC's uniformed forces, carried out through written policies that, on their face, violate various rights guaranteed to them under federal, State, and City law.

3.       Indeed, Defendants have enacted and consistently enforced policies that penalize the uniformed forces for taking as few as eight sick days within a year, thereby interfering with their rights to take up to 60 such days under the Family and Medical Leave Act and systematically retaliating against them for exercising those rights.

1

4.     The policies further state that if a member of the uniformed forces takes 12 or more sick days within a year, he or she will be designated as "chronic absent" and, as a result, stripped of various terms and conditions of employment, including access to voluntary overtime work.

5.     Should a member of the uniformed forces take 15 or more sick days within a year, Defendants' policies state explicitly that he or she is subject to termination – again, despite the fact that federal law protects employees' rights to take up to four times as many sick days.

6.     Moreover, Defendants' policies effectively codify disability discrimination within DOC, as members of the uniformed forces who suffer from recognized disabilities generally must use more sick days and require more medical leave than their counterparts who do not suffer from disabilities.

7.     By the same token, the policies punish military servicemembers and veterans who, in the course of their service to the United States, often sustain disabilities with which they must live for the rest of their lives, thereby generally causing them to use more sick days and require more medical leave than their counterparts who have not served.

8.     To redress these wrongs, Plaintiffs bring claims, on behalf of themselves and all persons similarly situated, for violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA"), the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.* ("Rehabilitation Act"), the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301, *et seq.* ("USERRA"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the FMLA and Rehabilitation Act, as well as Ms. Fulton's rights under the ADA.

10.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and City law.

11.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

12.     On or around April 1, 2019, Ms. Fulton filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and a simultaneous Complaint with the New York State Division of Human Rights ("NYSDHR") alleging, *inter alia*, individual and class discrimination claims under the ADA.

13.     The NYSDHR handled the investigation into Ms. Fulton's ADA claim and analogous State and City law claims.

14.     On or around November 12, 2019, the NYSDHR issued a probable cause determination in Ms. Fulton's favor.

15.     On or around January 3, 2020, the NYSDHR issued a final order dismissing Ms. Fulton's NYSDHR Complaint for administrative convenience, thereby granting Ms. Fulton permission "to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved."

16.     On or around December 20, 2019, Mr. Walcott filed a Charge of Discrimination with the EEOC alleging, *inter alia*, individual and class discrimination claims under the ADA.

17.     Within 90 days of receiving a Notice of Right to Sue from the EEOC, Mr. Walcott will seek leave of the Court to amend this pleading to add, *inter alia*, individual and class discrimination claims under the ADA.

18.     Any and all other prerequisites to the filing of this action have been met.

## PARTIES

**A.     Plaintiff Katrina Fulton**

19.     Ms. Fulton is a resident of the City of New York and has been employed by Defendants from on or around June 1, 2000 through the present, with intermittent absences during which she served as a Sergeant in the U.S. Army and U.S. Army Reserves.

20.     At all relevant times, Ms. Fulton was and is an "employee" of Defendants within the meaning of all relevant statutes.

**B.     Plaintiff Darnell Walcott**

21.     Mr. Walcott is a resident of the City of New York and has been employed by Defendants from on or around May 16, 2013 through the present, with intermittent absences during which he served as a Master of Arms in the U.S. Navy and U.S. Navy Reserves.

22.     At all relevant times, Mr. Walcott was and is an "employee" of Defendants within the meaning of all relevant statutes.

**C.     Defendant City of New York**

23.     The City is a municipal corporation that controls and oversees, *inter alia*, the operation of all prisons and jails throughout its five boroughs.

24.     At all relevant times, the City controlled and directed the terms of employment of Plaintiffs and all persons similarly situated.

25.     At all relevant times, the City maintained control, oversight, and direction of Plaintiffs and all persons similarly situated, including the implementation and enforcement of the unlawful employment policies and practices described herein.

26.     At all relevant times, the City was and is an "employer" within the meaning of all relevant statutes.

**D.    Defendant New York City Department of Correction**

27.     DOC manages and operates, *inter alia*, all prisons and jails throughout the City's five boroughs.

28.     At all relevant times, DOC controlled and directed the terms of employment of Plaintiffs and all persons similarly situated.

29.     At all relevant times, DOC maintained control, oversight, and direction of Plaintiffs and all persons similarly situated, including the implementation and enforcement of the unlawful employment policies and practices described herein.

30.     At all relevant times, DOC was and is an "employer" within the meaning of all relevant statutes.

## FACTS

**A.    Defendants' Absence Control and Sick Leave Policies**

31.     Defendants maintain an "Absence Control/Uniformed Sick Leave Policy" (the "Absence Control Policy") and "Sick Leave Regulations for Members in the Uniformed Force" ("Sick Leave Policy") (together, the "Policies"). *See* Exhibits A, B.

32.     The Policies apply to all members of DOC's uniformed force ("Officers").

33.     The Policies systematically: (i) interfere with Officers' FMLA rights; (ii) retaliate against them for exercising those rights; (iii) subject Officers with disabilities to disparate treatment and/or impact; and (iv) disparately impact Officers who have served in the military.

34.     Throughout Plaintiffs' employment, Defendants have subjected all Officers to the Policies.

35.     Under the Absence Control Policy, an Officer "who reports sick on twelve (12) or more work days within a twelve (12) month period" shall be classified as "chronic absent."

36.     The Absence Control Policy excludes from this calculation absences: (i) requiring confinement to a hospital; (ii) resulting from certain work-related injuries; and (iii) related to pregnancy.

37.     An Officer's "chronic absent" designation remains in effect for six months from the date the Officer returns to work.

38.     If the Officer is not absent during this six-month period, the "chronic absent" designation is removed; however, if the Officer is absent even once, the "chronic absent" designation is extended for an additional six months.

39.     An Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

40.     In addition to losing the foregoing benefits and privileges, pursuant to the Absence Control Policy, an Officer "who reports sick forty (40) or more work days within a twelve (12) month period may be subject to termination."

41.     Further, an Officer "who reports sick on fifteen (15) or more occasions within a twelve (12) month period may be subject to termination."

42.     Pursuant to the Sick Leave Policy, Officers on a leave of absence who have been designated as "chronic absent" or who have reported sick more than eight days within a calendar year are restricted from leaving their homes outside of a four-hour period of the day determined by Defendants.

43.     Defendants enforce this policy through unannounced home visits to the residences of Officers who are on leave.

44.     Under the Absence Control Policy, Officers "classified as chronic absent shall be given the highest priority for home visits[.]"

45.     Put differently, Officers designated as "chronic absent" are subject to heightened and disparate scrutiny relative to their peers who do not require FMLA-qualifying leave and/or suffer from disabilities.

46.     Through the Policies, Defendants discriminate against Officers who suffer from disabilities that require extended leave from work by, *inter alia*, subjecting them to heightened scrutiny, denying them benefits and privileges afforded to non-disabled Officers, and terminating their employment.

47.     Moreover, the penalties and scrutiny prescribed by the Policies are triggered well before the expiration of the 12 weeks of unpaid leave to which Officers are entitled under the FMLA.

48.     Further, the Policies disparately impact Officers who have served in the military and, therefore, are more likely to have sustained injuries that fall outside of the three exceptions to

the Absence Control Policy's provisions concerning "chronic absent" designations. *See supra* at ¶ 36.

**B.    Plaintiff Katrina Fulton**

    **i.    Background**

49.    Ms. Fulton has been employed by Defendants as a Correction Officer, part of the DOC's uniformed forces, from on or around June 1, 2000 through the present.

50.    Throughout her employment, Ms. Fulton has been stationed variously at the George Motchan Detention Center on Rikers Island and the Bellevue Hospital Center Prison Ward.

51.    Throughout her employment, Ms. Fulton has served as a Sergeant in the U.S. Army and U.S. Army Reserves, including overseas tours in Kuwait and Bahrain from in or around 2004 through in or around 2006.

    **ii.    "Chronic Absent" Designation**

52.    In or around 2005 and 2012, respectively, Ms. Fulton underwent two myomectomies to remove uterine fibroid tumors that had grown rapidly as a result of her military service.

53.    On or around March 18, 2019, Ms. Fulton underwent a hysterectomy, as the uterine fibroid tumors stemming from her military service had persisted despite her prior surgeries.

54.    Following the surgery, Ms. Fulton's doctor advised her that she would be required to miss approximately eight weeks of work.

55.    The doctor gave Ms. Fulton a letter reflecting the same and further stating that Ms. Fulton should not be restricted to her home under the Policies, as ambulation was beneficial to her recovery.

56.     On or around March 27, 2019, Ms. Fulton emailed the doctor's note to DOC's Health Management Division ("HMD").

57.     On or around March 29, 2019, Ms. Fulton requested that DOC grant her a reasonable accommodation for her disability.

58.     Specifically, consistent with her doctor's directive, Ms. Fulton asked that DOC relax its Sick Leave Policy by permitting her to leave her residence freely during the duration of her medical leave of absence.

59.     Defendants denied the request without ever discussing it with Ms. Fulton, let alone engaging her in a legitimate interactive process.

60.     On or around April 8, 2019, Ms. Fulton visited HMD and again submitted the doctor's note, this time in hard copy.

61.     During this visit, Ms. Fulton asked about her prior request for a reasonable accommodation.

62.     Ms. Fulton was told that her request had been denied and was not up for discussion, as DOC strictly adheres to the Policies and is unwilling to grant exceptions thereto.

63.     Without consulting with Ms. Fulton's doctor, Defendants ordered Ms. Fulton to return to work on or around May 2, 2019 – approximately two weeks earlier than her doctor had recommended.

64.     Nevertheless, in compliance with Defendants' directive, Ms. Fulton returned to work on or around May 2, 2019.

65.     Upon her return, Ms. Fulton informed HMD that she would require additional time off to visit with her doctor in order to be medically cleared to return to work.

66.    Ms. Fulton further informed HMD that she intended to use accrued paid time off to cover her time away from work.

67.    Thus, when she received her paystub on or around May 17, 2019, Ms. Fulton was dismayed to discover that Defendants had docked her five hours and 31 minutes of pay for being "absent without leave," or "AWOL," during the time she spent visiting with her doctor.

68.    On or around June 7, 2019, Ms. Fulton received written notice from DOC that she had been designated as "chronic absent," and that this designation would remain in place for at least six months from May 2, 2019.

69.    Defendants' enforcement of the Policies and designation of Ms. Fulton as "chronic absent" has adversely affected her in several ways.

70.    By way of example only, Ms. Fulton was docked six days of paid terminal leave and denied the opportunity to work voluntary overtime while the designation remained active.

71.    Moreover, after being designated as "chronic absent," Ms. Fulton was forced to quit her secondary job as a hairstylist in order to remain restricted to her residence for 20 hours per day throughout her medical leave, thereby complying with the Sick Leave Policy.

**C.    Plaintiff Darnell Walcott**

**i.    Background**

72.    Mr. Walcott has been employed Defendants as a Correction Officer, part of the DOC's uniformed forces, from on or around May 16, 2013 through the present.

73.    Throughout his employment, Mr. Walcott has been stationed at various commands on Rikers Island, including the Robert N. Davoren Complex, the West Facility, and the North Infirmary Command.

74.     Throughout his employment, Mr. Walcott has served as a Master of Arms in the U.S. Navy and U.S. Navy Reserves, including two overseas tours in Bahrain from in or around 2016 through in or around 2018.

**ii.     First "Chronic Absent" Designation**

75.     On or around August 23, 2018, Mr. Walcott was diagnosed with moderate to severe obstructive sleep apnea, one of several respiratory conditions from which he suffers as a result of his military service.

76.     Mr. Walcott disclosed his diagnosis to Defendants on or around September 11, 2018, providing a doctor's note and other documents detailing his medical history during his military service.

77.     As Mr. Walcott conveyed to DOC, his doctor insisted that he take a medical leave of absence from work until approximately November 2018, during which he was to sleep using a CPAP machine and have his progress monitored regularly.

78.     Defendants granted Mr. Walcott's request for medical leave and, thereafter, designated him as "chronic absent" under the Absence Control Policy.

79.     For the duration of Mr. Walcott's medical leave, he was monitored pursuant to Defendants' Policies to ensure that he did not leave his residence other than from 1:00 p.m. to 5:00 p.m.

80.     Mr. Walcott returned to work in or around early November 2018 under "medically monitored status," meaning he was not permitted to make physical contact with DOC inmates.

81.     Moreover, when Mr. Walcott returned from leave, DOC restricted him from working any voluntary overtime based on his "chronic absent" designation.

82.     Prior to his medical leave, Mr. Walcott typically worked approximately 16 hours of overtime per week.

83.     On or around December 4, 2018, Mr. Walcott appealed his "chronic absent" designation to Defendants.

84.     Defendants denied his appeal on or around January 4, 2019.

85.     On or around March 1, 2019, Mr. Walcott's doctor cleared him for full-time duty, meaning he was fully capable of working overtime and making physical contact with inmates.

86.     Nevertheless, DOC maintained Mr. Walcott's "chronic absent" designation, which is still in effect to this day.

87.     In other words, under the guise of the Absence Control Policy, Defendants reduced Mr. Walcott's hours worked – and, thus, his compensation – because he disclosed his disability and took approximately eight weeks of FMLA-qualifying leave from work.

**iii.    Second "Chronic Absent" Designation**

88.     While Mr. Walcott was in the military, he developed ringing in his ears, muffled hearing, and ear pain due to the conditions under which he served.

89.     To treat these disabilities, Mr. Walcott began seeing a doctor through the U.S. Department of Veteran Affairs ("VA") in or around February 2019.

90.     The doctor determined that Mr. Walcott suffered from eustachian tube dysfunction, which caused bilateral hearing loss.

91.     On or around May 1, 2019, Mr. Walcott's doctor informed him that he needed to wear hearing aids at all times while awake.

92.     The VA provided Mr. Walcott with hearing aids shortly thereafter.

93.     The hearing aids Mr. Walcott uses are internal and fitted to his ears.

94.     From on or around May 4, 2019 through on or around May 16, 2019, Mr. Walcott was out of work on an approved vacation.

95.     However, because he knew that his hearing aids would be considered contraband at Rikers Island, Mr. Walcott disclosed his disability and need for the hearing aids to DOC prior to his return to work on or around May 17, 2019.

96.     Immediately upon his return, Mr. Walcott was asked to meet with a doctor at HMD, who suggested that DOC may need to "medically discharge" Mr. Walcott, meaning terminate his employment, because he required hearing aids to treat his disability.

97.     That same day, DOC placed Mr. Walcott on mandatory "sick leave" and designated him as "chronic absent" for a second time, even though his original "chronic absent" designation was still in effect.

98.     Further, DOC asked Mr. Walcott to have an ear, nose, and throat doctor complete a Treating Physician's Summary Report (often referred to by Officers as a "green sheet") regarding his hearing loss by June 15, 2019.

99.     Throughout Mr. Walcott's mandatory "sick leave," he was paid his normal, straight time wages, but denied the opportunity to work the approximately 16 hours of overtime he typically worked each week prior to the disclosure of his disability and request for medical leave.

100.    Further, as with his prior "chronic absent" designation and pursuant to the Policies, Mr. Walcott was restricted from leaving his residence outside of the hours of 1:00 p.m. to 5:00 p.m. and monitored by DOC to ensure his compliance.

101.    On or around June 15, 2019, Mr. Walcott met with a DOC employee at HMD and submitted the completed green sheet, along with additional medical documentation, including a doctor's note, hearing test results, and CAT scan results.

102.    Nevertheless, DOC asked that Mr. Walcott obtain and submit another doctor's note and extended his "sick leave" for two more weeks, thereby further restricting him from working overtime.

103.    On or around June 29, 2019, Mr. Walcott returned to DOC and provided HMD with all additional documentation that had been requested, including a doctor's note stating that he need not be restricted at work due to his use of hearing aids.

104.    Nevertheless, Defendants extended Mr. Walcott's "sick leave" by an additional four weeks and made clear that they intended to "medically separate" him – *i.e.*, terminate his employment.

105.    Thereafter, DOC extended Mr. Walcott's "sick leave" through on or around September 21, 2019.

106.    On or around July 11, 2019, Mr. Walcott submitted to DOC a formal request for a reasonable accommodation.

107.    Specifically, Mr. Walcott requested: (i) permission to wear his hearing aids at all times; (ii) permission to carry spare batteries for his hearing aids; and (iii) removal of his "chronic absent" designation.

108.    On or around August 3, 2019, at which point Mr. Walcott still had not received a decision with respect to his request for a reasonable accommodation, DOC formally charged him with violating the Policies by using accrued paid time off due to his hearing disability.

109.    On or around September 9, 2019, Mr. Walcott received a letter from DOC stating that his request for a reasonable accommodation had been granted.

110.    The letter stated that Mr. Walcott was permitted to return to full duty and wear his hearing aids; however, it did not specify whether his "chronic absent" designation – and the

restrictions that came with it, including the restriction against working voluntary overtime – had been lifted.

111.    That same day, Mr. Walcott emailed DOC asking for clarification.

112.    Mr. Walcott eventually received clarification on or around October 24, 2019, when he was informed by DOC that his "chronic absent" designation was being extended to approximately March 2020.

113.    Mr. Walcott appealed this determination on or around October 29, 2019.

114.    The Warden of the North Infirmary Command, where Mr. Walcott is currently stationed, denied the appeal on or around November 21, 2019.

## CLASS ACTION ALLEGATIONS

115.    Pursuant to Federal Rule of Civil Procedure ("FRCP") 23, Plaintiffs bring their claims as a class action.

116.    Plaintiffs bring their First, Second, Fourth, Fifth, and Sixth Causes of Action on behalf of themselves and the Class, as defined *infra* at ¶ 119.

117.    Ms. Fulton also brings her Third Cause of Action on behalf of herself and the Class.

118.    Moreover, Plaintiffs bring their Seventh, Eighth, and Ninth Causes of Action on behalf of themselves and the Subclass, as defined *infra* at ¶ 123.

A.    **Class Definitions**

119.    Plaintiffs seek to maintain claims on behalf of themselves and a class of all similarly-situated Officers who have been designated as "chronic absent" under the Policies at any time during the full statute of limitations period (the "Class").

120.    Plaintiffs allege, on behalf of themselves and the Class, that, through the Policies, Defendants violate the FMLA by interfering with Officers' rights to take up to 12 weeks of unpaid leave per year and retaliate against them for exercising those rights.

121.    Plaintiffs further allege, on behalf of themselves and the Class, that, through the Policies, Defendants violate the Rehabilitation Act, NYSHRL, and NYCHRL by discriminating against Officers who suffer from disabilities.

122.    Ms. Fulton alleges analogous violations, on behalf of herself and the Class, under the ADA.

123.    Plaintiffs also seek to maintain claims on behalf of themselves and a subclass of all Class members who have served in the U.S. Armed Forces in any capacity, including as part of the National Guard or the Reserve Components of any branch of the U.S. Armed Forces (the "Subclass").

124.    Plaintiffs allege, on behalf of themselves and the Subclass, that the Policies disparately impact Officers who have served in the U.S. Armed Forces in violation of the USERRA, NYSHRL, and NYCHRL.

125.    Plaintiffs have standing to seek such relief on behalf of the Class and Subclass because Defendants' unlawful practices have adversely impacted them individually and as a group.

126.    The unlawful practices described herein are part of Defendants' normal course of conduct.

**B.    <u>Numerosity and Impracticability of Joinder</u>**

127.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable.

128.    While the exact number of the members of the Class and Subclass and are unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are approximately five thousand (5,000) members of the Class and two thousand (2,000) members of the Subclass.

129.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

**C.    Common Questions of Law and Fact**

130.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and Subclass.

131.    These common questions predominate over any questions only affecting the members of the Class or Subclass individually.

132.    Indeed, there are few, if any, purely individual issues in this action.

133.    The questions of law and fact that are common to Plaintiffs and the Class include, without limitation:

(a)    Whether the Policies restricted Plaintiffs and the Class from taking up to 12 weeks of unpaid family and medical leave per year;

(b)    Whether Officers who suffer from disabilities are designated as "chronic absent" or otherwise penalized under the Policies more frequently than those who do not suffer from disabilities;

(c)    Whether Plaintiffs and the Class suffered compensatory damages;

(d)    Whether Plaintiffs and the Class are entitled to punitive and/or liquidated damages; and

(e)    Whether Plaintiffs and the Class are entitled to injunctive relief.

134. Additional questions of law and fact that are common to Plaintiffs and the Subclass include, without limitation:

(a) Whether Officers who have served in the U.S. Armed Forces are designated as "chronic absent" or otherwise penalized under the Policies more frequently than those who have not served in the U.S. Armed Forces; and

(b) Whether the Policies disparately impact Officers who have served in the U.S. Armed Forces.

135. Therefore, the commonality requirement of FRCP 23(a) is satisfied.

**D.    Typicality of Claims and Relief Sought**

136. Plaintiffs' claims are typical of the claims of the Class and Subclass members they seek to represent.

137. Plaintiffs, the Class, and the Subclass work, or have worked, for Defendants and are, or were, subject to the same policies and practices.

138. Plaintiffs, the Class, and the Subclass all allege that they were subjected to the Policies, which interfere with their FMLA rights, retaliate against them for exercising those rights, and discriminate against them based on their disabilities and/or service in the U.S. Armed Forces.

139. The unlawful policies and practices suffered by Plaintiffs, and the damages resulting therefrom, are typical of Defendants' treatment of Officers generally, and of the Class and Subclass specifically.

140. Therefore, the typicality requirement of FRCP 23(a) is satisfied.

**E.    Adequacy of Representation**

141. Plaintiffs will fairly and adequately protect the interests of the Class and Subclass because their interests are coextensive and aligned with those of the Class and Subclass members.

142.    Plaintiffs have no interests adverse to those of the Class and Subclass they seek to represent.

143.    Plaintiffs are willing and able to represent the Class and Subclass as fairly and vigorously as they pursue their similar individual claims.

144.    Plaintiffs have retained counsel who are competent, qualified, and experienced in employment class action litigation.

145.    Plaintiffs' counsel are able to meet the demands necessary to litigate a class action of this size and complexity.

146.    The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual, Class, and Subclass claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

**F.    Requirements of FRCP 23(b)(1)**

147.    Without certification of the Class and Subclass, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

148.    Accordingly, certification of the Class and Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class, and the Subclass.

149.    By filing this Class Action Complaint, Plaintiffs are preserving the rights of the Class and Subclass members with respect to the statute of limitations on their claims.

150.    Therefore, not certifying the Class and Subclass would substantially impair and/or impede the remaining members' ability to protect their interests.

## G.    Requirements of FRCP 23(b)(2)

151.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs, the Class, and Subclass, by interfering with their FMLA rights, retaliating against them for exercising their FMLA rights, and subjecting them to discrimination.

152.    These acts are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiffs, the Class, and the Subclass as a whole.

153.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact at issue in this action.

154.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs', the Class's, and the Subclass's entitlement to monetary and non-monetary remedies for the unlawful conduct alleged.

155.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this action.

## H.    Requirements of FRCP 23(b)(3)

156.    The common issues of fact and law affecting Plaintiffs, the Class, and the Subclass, including, without limitation, the common issues identified in the paragraphs above, predominate over any issues affecting only individual claims.

157.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and those of the Class and Subclass.

158.    The cost of proving Defendants' pattern and practice of unlawful conduct makes it impractical for the members of the Class and Subclass to pursue their claims individually.

159.    The class action will not be difficult to manage for several reasons including, without limitation: (i) the existence of written policies that are applicable to all Officers and

expressly outline Defendants' unlawful practices; (ii) the discrete organizational nature of all members of the Class (they must have worked for Defendants as Officers) and Subclass (they must have worked for Defendants as Officers and served in the U.S. Armed Forces); and (iii) the common questions of law and fact described in the paragraphs above.

<strong><u>FIRST CAUSE OF ACTION</u></strong><br><strong><u>VIOLATIONS OF THE FMLA: INTERFERENCE</u></strong><br><strong><em>(On Behalf of Plaintiffs and the Class)</em></strong>

160.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

161.    As a municipal corporation and a government agency, respectively, Defendants the City and DOC are subject to the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

162.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

163.    By the actions described above, among others, Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

164.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

165.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

166.    By penalizing Plaintiffs and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have interfered with Plaintiffs' and the Class's rights under the FMLA, including their right to take up to 60 days of unpaid family or medical leave per year.

167.    As a direct and proximate result of Defendants' unlawful violations of the FMLA, Plaintiffs and the Class are entitled to an award of damages to the greatest extent permitted by law.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FMLA: RETALIATION
### (*On Behalf of Plaintiffs and the Class*)

168.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

169.    As a municipal corporation and a government agency, respectively, Defendants the City and DOC are subject to the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

170.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

171.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

172.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

173.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

174.    By penalizing Plaintiffs and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have retaliated against Plaintiffs and the Class for exercising their FMLA rights, including their right to take up to 60 days of unpaid family or medical leave per year.

175.    As a direct and proximate result of Defendants' unlawful violations of the FMLA, Plaintiffs and the Class are entitled to an award of damages to the greatest extent permitted by law.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE ADA: DISABILITY DISCRIMINATION**
(***On Behalf of Plaintiff Katrina Fulton and the Class***)

176.    Ms. Fulton, on behalf of herself and the Class, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

177.    During the full statutory period, Ms. Fulton and the Class were protected by the provisions of the ADA, 42 U.S.C. §§ 12101, *et seq*., and all applicable regulations thereunder.

178.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

179.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

180.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

181.    Upon information and belief, Officers who suffer from disabilities more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who do not suffer from disabilities.

182.    Accordingly, by penalizing Ms. Fulton and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Ms. Fulton and the Class to disparate treatment and/or impact on the basis of their disabilities in violation of the ADA.

183.    As a direct and proximate result of Defendants' unlawful violations of the ADA, Ms. Fulton and the Class are entitled to an award of damages to the greatest extent permitted by law.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE REHABILITATION ACT: DISABILITY DISCRIMINATION
### (*On Behalf of Plaintiffs and the Class*)

184.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

185.    Defendants receive federal financial assistance and are therefore subject to the provisions of the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*, and all applicable regulations thereunder.

186.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*, and all applicable regulations thereunder.

187.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

188.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

189.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

190.    Upon information and belief, Officers who suffer from disabilities more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who do not suffer from disabilities.

191.    Accordingly, by penalizing Plaintiffs and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs and the Class to disparate treatment and/or impact on the basis of their disabilities in violation of the Rehabilitation Act.

192.    As a direct and proximate result of Defendants' unlawful violations of the Rehabilitation Act, Plaintiffs and the Class are entitled to an award of damages to the greatest extent permitted by law.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: DISABILITY DISCRIMINATION**
(*On Behalf of Plaintiffs and the Class*)

193.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

194.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq*. and all applicable regulations thereunder.

195.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

196.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

197.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

198.    Upon information and belief, Officers who suffer from disabilities more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who do not suffer from disabilities.

199.    Accordingly, by penalizing Plaintiffs and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs and

the Class to disparate treatment and/or impact on the basis of their disabilities in violation of the NYSHRL.

200.    As a direct and proximate result of Defendants' unlawful violations of the NYSHRL, Plaintiffs and the Class are entitled to an award of damages to the greatest extent permitted by law.

### SIXTH CAUSE OF ACTION
### VIOLATIONS OF THE NYCHRL: DISABILITY DISCRIMINATION
#### (*On Behalf of Plaintiffs and the Class*)

201.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

202.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.* and all applicable regulations thereunder.

203.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

204.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

205.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

206.    Upon information and belief, Officers who suffer from disabilities more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who do not suffer from disabilities.

207.    Accordingly, by penalizing Plaintiffs and the Class under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs and the Class to disparate treatment and/or impact on the basis of their disabilities in violation of the NYCHRL.

208.    As a direct and proximate result of Defendants' unlawful violations of the NYCHRL, Plaintiffs and the Class are entitled to an award of damages to the greatest extent permitted by law.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF USERRA: UNIFORMED SERVICE DISCRIMINATION**
***(On Behalf of Plaintiffs and the Subclass)***

209.    Plaintiffs, on behalf of themselves and the Subclass, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

210.    During the full statutory period, Plaintiffs and the Subclass were protected by the provisions of the USERRA, 38 U.S.C. §§ 4301, *et seq.* and all applicable regulations thereunder.

211.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

212.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv)

promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

213.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

214.    Upon information and belief, Officers who serve or have served in the U.S. Armed Forces more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who have not served.

215.    Accordingly, by penalizing Plaintiffs and the Subclass under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs and the Subclass to disparate treatment and/or impact on the basis of their uniformed service in violation of the USERRA.

216.    As a direct and proximate result of Defendants' unlawful violations of the USERRA, Plaintiffs and the Subclass are entitled to an award of damages to the greatest extent permitted by law.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF NYSHRL: MILITARY STATUS DISCRIMINATION**
**(*On Behalf of Plaintiffs and the Subclass*)**

217.    Plaintiffs, on behalf of themselves and the Subclass, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

218.    During the full statutory period, Plaintiffs and the Subclass were protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq*. and all applicable regulations thereunder.

219.    Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

220.    Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

221.    The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

222.    Upon information and belief, Officers who serve or have served in the U.S. Armed Forces more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who have not served.

223.    Accordingly, by penalizing Plaintiffs and the Subclass under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs and the Subclass to disparate treatment and/or impact on the basis of their military status in violation of the NYSHRL.

224.    As a direct and proximate result of Defendants' unlawful violations of the NYSHRL, Plaintiffs and the Subclass are entitled to an award of damages to the greatest extent permitted by law.

**NINTH CAUSE OF ACTION**
**VIOLATIONS OF NYCHRL: UNIFORMED SERVICE DISCRIMINATION**
(*On Behalf of Plaintiffs and the Subclass*)

225.     Plaintiffs, on behalf of themselves and the Subclass, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

226.     During the full statutory period, Plaintiffs and the Subclass were protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.* and all applicable regulations thereunder.

227.     Defendants drafted, implemented, and consistently enforced the Policies, which, *inter alia*, designate Officers as "chronic absent" for reporting sick on 12 or more workdays within a 12-month period, subject to certain exceptions.

228.     Under the Policies, an Officer who is designated as "chronic absent" loses, *inter alia*, the following benefits and privileges while the designation remains in effect: (i) assignment to a steady tour; (ii) assignment to a specified post or duties; (iii) access to voluntary overtime; (iv) promotions; (v) secondary employment; (vi) assignment to preferential/special units or commands; and (vii) transfers.

229.     The Policies further state, *inter alia*, that Officers who report sick on 15 or more workdays within a 12-month period may be subject to termination.

230.     Upon information and belief, Officers who serve or have served in the U.S. Armed Forces more frequently take 12 or more days off from work within a given 12-month period as compared to their counterparts who have not served.

231.     Accordingly, by penalizing Plaintiffs and the Subclass under the Policies for taking 12 or more days off from work within a 12-month period, Defendants have subjected Plaintiffs

and the Subclass to disparate treatment and/or impact on the basis of their uniformed service in violation of the NYCHRL.

232.    As a direct and proximate result of Defendants' unlawful violations of the NYCHRL, Plaintiffs and the Subclass are entitled to an award of damages to the greatest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and the Subclass, respectfully request that the Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal, State, and City law;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiffs with a list of all members of the Class and Subclass, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Designate Plaintiffs as representatives of the Class, and their counsel of record, Faruqi & Faruqi, LLP, as class counsel;

E.    Designate Plaintiffs as representatives of the Subclass, and their counsel of record, Faruqi & Faruqi, LLP, as class counsel;

F.    Grant Plaintiffs, the Class, and the Subclass an award of damages in an amount to be determined at trial, plus prejudgment interest to the extent provided under the law, to compensate them for their economic damages;

G.    Grant Plaintiffs, the Class, and the Subclass an award of damages in an amount to be determined at trial to compensate them for all non-monetary and/or compensatory damages they have suffered, including, without limitation, compensation for emotional distress;

H.    Grant Plaintiffs, the Class, and the Subclass an award of damages in an amount to be determined at trial, plus prejudgment interest to the extent provided under the law, for any and all other monetary and/or non-monetary losses they have suffered;

I.    Grant Plaintiffs, the Class, and the Subclass an award of punitive damages in an amount to be determined at trial;

J.    Grant Plaintiffs, the Class, and the Subclass an award of liquidated damages in an amount to be determined at trial;

K.    Grant Plaintiffs, the Class, and the Subclass an award of reasonable attorneys' fees to the greatest extent permitted by law;

L.    Grant Plaintiffs, the Class, and the Subclass an award of reasonable costs and expenses that they have incurred in this action, including, without limitation, filing fees, deposition transcript costs, and expert witness fees;

M.    Grant Plaintiffs, the Class, and the Subclass an award of prejudgment interest to the greatest extent permitted by law;

N.    Grant Plaintiffs all other available damages to the greatest extent permitted by law; and

O.    Grant such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves, the Class, and the Subclass, hereby demand a trial by jury on all issues of fact and damages.

Dated: January 7, 2020               **FARUQI & FARUQI, LLP**
      New York, New York

                                 By: <u>*/s/ Innessa M. Huot*</u>
                                     Innessa M. Huot
                                     Alex J. Hartzband
                                     Camilo M. Burr (not yet admitted)

                               685 Third Avenue, 26th Floor
                               New York, New York 10017
                               Telephone: 212-983-9330
                               Facsimile: 212-983-9331
                               ihuot@faruqilaw.com
                               ahartzband@faruqilaw.com
                               cburr@faruqilaw.com

                               *Attorneys for Plaintiffs, the Proposed Class,*
                               *and the Proposed Subclass*